UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **MAY 0 7 2019**

UNITED STATES OF AMERICA

    - v. -

TODD CAPSER,

       Defendant.

- - - - - - - - - - - - - - - - - - x

**SEALED INDICTMENT**

19 Cr.

**19 CRIM 337**

**COUNT ONE**
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury Charges:

## Overview of the Conspiracy

1.    From at least in or about January 2016 through at least in or about April 2019, TODD CAPSER, the defendant, CAPSER's father ("CC-1"), and others known and unknown, perpetrated a scheme to defraud a financial institution based in Toronto, Canada ("Financial Institution-1"), by inducing it, through false and misleading representations and omissions, to loan approximately $43.3 million to an entity incorporated by CAPSER ("Capser Entity-1"), for the purchase of two chemical and oil tankers ("Tanker-1" and "Tanker-2")(collectively, the "Tankers"). After obtaining the loan from Financial Institution-1 and purchasing the Tankers, CAPSER, CC-1, and others known and unknown attempted to induce, through false and misleading representations and omissions, at least nine other

1

JUDGE OETKEN

financial institutions, including an American global investment management corporation headquartered in Manhattan, New York ("Financial Institution-2"), a financial institution based in Dallas, Texas ("Financial Institution-3"), and a financial institution based in Salt Lake City, Utah ("Financial Institution-4") (collectively, and with Financial Institution-1, the "Financial Institutions"), to loan between approximately $46 million and $52 million each to Capser Entity-1 for the refinancing of the approximately $43.3 million loan that Financial Institution-1 had extended.

2. TODD CAPSER, the defendant, CC-1, and others known and unknown, fraudulently induced Financial Institution-1 to make the approximately $43.3 million loan, and attempted to induce the other Financial Institutions to make the refinancing loans of between approximately $46 million and $52 million each, by, among other things: (a) fraudulently obtaining documents from a company that provides wealth-management services to private clients ("Trust Company-1"); (b) altering the Trust Company-1 documents, and forging additional Trust Company-1 documents, to make it appear as though CC-1 held an investment portfolio at Trust Company-1 composed of securities worth tens of millions of dollars, which could serve as collateral for the loans; (c) sending the altered and forged Trust Company-1 documents to certain of the Financial Institutions; (d) creating fake email

2

accounts for employees of Trust Company-1, and sending emails
from those accounts to certain of the Financial Institutions to
make it appear as though CC-1 held an investment portfolio at
Trust Company-1 composed of securities worth tens of millions of
dollars; and (e) making false and misleading representations and
omissions about the financial assets of CAPSER, CC-1, and their
family to certain of the Financial Institutions.  In addition,
in an effort to engender sympathy, deflect questions, and
explain suspicious behavior, CAPSER falsely represented to
certain of the Financial Institutions that his daughter was
terminally ill with cancer.

## Capser's Incorporation of the Capser Entities and False and Misleading Representations and Omissions to Trust Company-1

3.  On or about September 23, 2014, TODD CAPSER, the
defendant, incorporated an entity in the Marshall Islands
("Capser Entity-2").  CAPSER was listed as the sole director and
officer.

4.  On or about April 6, 2016, TODD CAPSER, the defendant,
incorporated two additional entities in the Marshall Islands
("Capser Entity-3" and "Capser Entity-4").  CAPSER was listed as
an officer of both companies.

5.  In or about May 2016, TODD CAPSER, the defendant, was
engaged to be married to an individual ("Individual-1") whose
father held an account at, and was considered an important

3

client of, Trust Company-1.  Through his relationship with
Individual-1, CAPSER was introduced to two employees of Trust
Company-1 ("Employee-1" and "Employee-2").

6.    In or about May 2016, TODD CAPSER, the defendant, told
Employee-1 and Employee-2 that he and CC-1 had substantial
assets, which were currently held at an American multinational
financial services company ("Bank-1"), but that he and CC-1
wanted to move those assets to an account they would open at
Trust Company-1.  Specifically, CAPSER said that he was
contemplating a large business deal, asked what types of
documents Trust Company-1 could create to support the deal if
CAPSER and CC-1 moved their assets to Trust Company-1, and
requested templates of such documents.  In truth and in fact,
neither CAPSER nor CC-1 held substantial assets at Bank-1.   .
Employee-1 agreed to send CAPSER unsigned templates.

7.    On or about May 24, 2016, following further
discussions between TODD CAPSER, the defendant, and Trust
Company-1 employees, Employee-2 sent an email to CAPSER, to
which he attached a template for an account control agreement
with Trust Company-1.  The template for the account control
agreement was unsigned.

8.    If the account control agreement had been executed, it
would have involved four parties: Trust Company-1; TODD CAPSER,
the defendant; CC-1; and the "Creditor," a financial institution

to be determined. Essentially, Trust Company-1 would have maintained a securities account for CAPSER and CC-1, in which the financial institution would have held an interest. Based on that interest, the financial institution would have extended credit to CAPSER and CC-1.

9. On or about May 31, 2016, TODD CAPSER, the defendant, incorporated Capser Entity-1 in Delaware (collectively with Capser Entity-2, Capser Entity-3, and Capser Entity-4, the "Capser Entities").

Capser's $43.3 Million Fraud on Financial Institution-1

10. In or about January 2016, TODD CAPSER, the defendant, approached Financial Institution-1 about obtaining a bridge loan for the purchase of two oil tankers. A bridge loan is a short-term loan that is designed to be used only until longer-term financing can be secured. CAPSER represented to Financial Institution-1 that he and CC-1 had substantial assets that could be used as collateral for the loan. Financial Institution-1 requested documentation of the collateral.

11. From at least in or about January 2016 through at least in or about June 2016, TODD CAPSER, the defendant, sent documents to Financial Institution-1 purporting to establish the existence of millions of dollars of his, CC-1's, and their family's financial assets, including a cattle company, a ranch, related real property, cash, and securities. In truth and in

fact, neither CAPSER nor CC-1 had such assets, and the cattle company and ranch did not exist.

12.   For example, on or about June 30, 2016, TODD CAPSER, the defendant, sent Financial Institution-1 a document purporting to be a statement of CC-1's account holdings at Trust Company-1.   The document listed more than 60 companies in which CC-1 purportedly owned shares.   The total market value of the listed shares was approximately $19.2 million.   In truth and in fact, neither CAPSER nor CC-1 ever held an account at Trust Company-1 or owned the listed shares.

13.   On or about July 22, 2016, Financial Institution-1 sent TODD CAPSER, the defendant, Capser Entity-1, and Capser Entity-2 a commitment letter for the financing of the purchase of the Tankers, which were owned by a Hong Kong shipping firm ("Shipping Firm-1").   Their purchase price was approximately $20.4 million each, for a total of approximately $40.8 million.

14.   In or about August 2016, two Panamanian subsidiaries of Shipping Firm-1 (the "Shipping Firm-1 Subsidiaries") entered into memoranda of understanding and bareboat charters with Capser Entity-3 and Capser Entity-4 related to the Tankers.   A bareboat charter is a lease agreement whereby the charterers (in this case, the Shipping Firm-1 Subsidiaries) obtain possession and control of ships (in this case, the Tankers) owned by the owners (in this case, Capser Entity-3 and Capser Entity-4).   The

6

charterers pay the owners for the use of the ships, and also pay for the ships' operating expenses. Here, the bareboat charters obligated the Shipping Firm-1 Subsidiaries to pay Capser Entity-3 and Capser Entity-4 $8,500 per day, per ship. In essence, the plan was for Capser Entity-3 and Capser Entity-4 to buy the Tankers, but immediately lease them back to the Shipping Firm-1 Subsidiaries.

15. In or about September 28, 2016, the Shipping Firm-1 Subsidiaries sold the Tankers to Capser Entity-3 and Capser Entity-4. The Tankers were leased back to Shipping Firm-1 or the Shipping Firm-1 Subsidiaries pursuant to the bareboat charters.

16. On or about October 5, 2016, Financial Institution-1 extended a loan to Capser Entity-1 for approximately $43.3 million for the purchase of the Tankers. The loan was extended pursuant to a credit agreement. Pursuant to the terms of the credit agreement, interest on the loan was 12% per year, and the full amount was due on or about April 5, 2018.

17. On or about October 6, 2016, pursuant to the terms of the credit agreement, CC-1 signed an agreement with Financial Institution-1 pursuant to which he granted Financial Institution-1 a security interest in the account that he purportedly held at Trust Company-1 as collateral for the approximately $43.3 million loan and the credit agreement. As

7

noted, in truth and in fact, neither CC-1 nor TODD CAPSER, the defendant, ever held an account at Trust Company-1.

18.   An account control agreement from Trust Company-1 was also made part of the credit agreement.  The account control agreement, which was signed by CC-1 and purportedly signed by Employee-2, was based on the template that Employee-2 had sent to TODD CAPSER, the defendant, on or about May 24, 2016.  In truth and in fact, CAPSER had forged Employee-2's signature.

19.   On or about October 6, 2016, payments totaling approximately $35 million were wired from an account controlled by Financial Institution-1 to an account controlled by Shipping Firm-1 for the purchase of the Tankers.  An American multinational investment bank and financial services company headquartered in Manhattan, New York ("Bank-2") acted as the intermediary or correspondent bank for the transaction.

20.   On or about October 7, 2016, the Tankers were delivered to Capser Entity-3 and Capser Entity-4.

21.   On or about October 7, 2016, the Shipping Firm-1 Subsidiaries began operating the Tankers pursuant to the bareboat charters.

## Capser's False and Misleading Representations and Omissions to Broker-Dealer-1 and Certain of the Financial Institutions

22.   At some point after the Shipping Firm-1 Subsidiaries began operating the Tankers, the Shipping Firm-1 subsidiaries

experienced financial difficulties unrelated to the fraudulent scheme described herein.  As a result, the Shipping Firm-1 Subsidiaries began defaulting on the payments they owed to Capser Entity-3 and Capser Entity-4.

23.  By in or about March 2018, the Shipping Firm-1 Subsidiaries were over $1 million in arrears.

24.  In or about March 2018, TODD CAPSER, the defendant, retained an American broker-dealer specializing in transport finance ("Broker-Dealer-1") to help Capser Entity-1 find a financial institution to refinance the approximately $43.3 million loan that Financial Institution-1 had extended.  That loan had been a short-term bridge loan not intended to remain extended past its due date of on or about April 5, 2018.  CAPSER wanted to use Broker-Dealer-1 to find a financial institution that would extend a longer-term loan to Capser Entity-1.

25.  Following its retention, TODD CAPSER, the defendant, made numerous false and misleading representations and omissions to Broker-Dealer-1 regarding his, CC-1's, and their family's financial assets, including representations regarding CC-1's account at Trust Company-1.

26.  Based on the false and misleading representations and omissions that TODD CAPSER, the defendant, had made, Broker-Dealer-1 began soliciting financial institutions as potential lenders for the longer-term refinancing loan that CAPSER was

seeking for Capser Entity-1.  In or about August 2018, Broker-Dealer-1 sent some of those financial institutions a document based on information that CAPSER had provided.  Specifically, the document stated that Capser Entity-1 was seeking to refinance a bridge loan in the amount of approximately $46 million, and that collateral available to support the refinancing included a diversified stock portfolio valued at approximately $74 million.  The document contained a detailed breakdown of the portfolio, and also stated that CAPSER was the managing partner, a member of the board of directors, and a shareholder in the same non-existent cattle company described in documents CAPSER had sent to Financial Institution-1.

27.  In total, at least seven financial institutions, including Financial Institution-2, signed non-disclosure agreements or term sheets with Capser Entity-1 and TODD CAPSER, the defendant, pertaining to contemplated refinancing loans of between approximately $46 million and $52 million, based on the false and misleading representations and omissions that CAPSER had made to them through Broker-Dealer-1.

### Capser's Attempted $50.1 Million Fraud on Financial Institution-2

28.  On or about August 31, 2018, Broker-Dealer-1 Employee sent an email to an employee at Financial Institution-2 which stated that Broker-Dealer-1 had been engaged to assist Capser

Entity-1 with the refinancing of an existing arrangement involving two oil tankers; that the target financing amount was approximately \$46 million; and that collateral available included a diversified stock portfolio with a market value of approximately \$70 million.

29. From at least in or about September 2018 through at least in or about December 2018, TODD CAPSER, the defendant, Broker-Dealer-1, and Financial Institution-2 discussed the possibility of Financial Institution-2 extending an approximately \$50.1 million loan to Capser Entity-1 to refinance the approximately \$43.3 million loan that Financial Institution-1 had extended. In connection with those discussions, CAPSER sent Financial Institution-2 several documents purporting to be from Trust Company-1, including an account control agreement between Trust Company-1, CC-1, and Financial Institution-1, which was purportedly signed by Employee-2; a November 29, 2018 email purporting to be from Trust Company-1 to CC-1 stating that the balance of his account was approximately \$72.3 million; a December 4, 2018 email purporting to be from an employee at Trust Company-1 ("Employee-3") to CC-1 stating that, as of December 3, 2018, the closing balance for his account was approximately \$73.2 million; and a December 4, 2018 email purporting to be from a different employee at Trust Company-1 ("Employee-4") to CC-1 stating that the closing balance for his

11

account described in the December 4, 2018 email purporting to be
from Employee-3 was correct.

30.   In or about December 2018, as part of its due
diligence process for the approximately $50.1 million loan that
TODD CAPSER, the defendant, was seeking, Financial Institution-2
contacted Trust Company-1 to confirm the existence of CC-1's
account.

31.   On or about December 4, 2018, Trust Company-1 informed
Financial Institution-2 that CC-1 did not hold, and had never
held, an account at Trust Company-1 or any of its affiliates,
and that it believed the documents purporting to be from Trust
Company-1 that CAPSER had sent to Financial Institution-2 were
forgeries.

32.   On or about December 4, 2018, TODD CAPSER, the
defendant, participated in a conference call with employees of
Financial Institution-2.  Also participating in the call was an
individual ("Individual-2") who purported to be Employee-3.   In
truth and in fact, Individual-2 was not Employee-3 or any other
employee of Trust Company-1.

33.   On or about December 4, 2018, Financial Institution-2
communicated to TODD CAPSER, the defendant, that it was aware
that neither he nor CC-1 held an account or any assets at Trust
Company-1, and that Financial Institution-2 would not proceed

12

with the approximately $50.1 million refinancing loan that CAPSER was seeking.

34.   On or about December 5, 2018, TODD CAPSER, the defendant, left a voicemail for an employee of Financial Institution-2 in which he stated, "I imagine you're not supposed to speak with me, but I was hoping you might call me, as I need to apologize to you man to man."

35.   On or about December 5, 2018, Trust Company-1 sent a cease-and-desist letter to TODD CAPSER, the defendant, and CC-1. The letter stated that "no member of the Capser family has or has ever had any account at [Trust Company-1] and we hold none of your assets."

36.   In or about December 2018, TODD CAPSER, the defendant, participated in a phone call with two employees of Financial Institution-1, in which he claimed that the Capser Entities were "real," but admitted that "[Trust Company-1] is not real. . . .   I fabricated all that to get this deal done. . . .   The account is not real.   I fabricated it all. . . .   Everything, absolutely everything about [Trust Company-1]."   When one of the Financial Institution-1 employees stated that Financial Institution-1 had received daily statements from Trust Company-1 purporting to show CC-1's account balance, CAPSER said, "Those aren't real."   When a different Financial Institution-1 employee asked if that meant

13

CAPSER had created a fake email account to send the daily statements, CAPSER said, "Yes." CAPSER also confirmed that "the money" was "not real."

37.  During the same phone conversation, TODD CAPSER, the defendant, acknowledged that CC-1 had signed several documents related to the approximately $43.3 million loan that Financial Institution-1 had extended and participated in multiple phone calls with Financial Institution-1 related to the loan.

### Capser's Attempted $50 Million Fraud
### on Financial Institution-3

38.  In or about January 2019, TODD CAPSER, the defendant, contacted Financial Institution-3, seeking a loan of approximately $50 million for the refinancing of the $43.3 million loan that Financial Institution-1 had extended. Notwithstanding CAPSER's admission to Financial Institution-1 the previous month that CC-1 did not have an investment portfolio at Trust Company-1, he again communicated that CC-1's investment portfolio at Trust Company-1 could serve as collateral for the loan.

39.  In or about January 2019, CC-1 participated in a phone call with an employee of Financial Institution-3, during which CC-1 verified that his investment portfolio at Trust Company-1 could serve as collateral for the contemplated approximately $50 million refinancing loan.

14

40. On or about February 28, 2019, TODD CAPSER, the defendant, sent an email to an employee of Financial Institution-3, attaching a document purportedly from Trust Company-1 that listed securities held by CC-1 with a market value of approximately $108.2 million.

41. On or about March 4, 2019, Financial Institution-3 declined to extend the contemplated $50 million refinancing loan to TODD CAPSER, the defendant.

### Capser's Attempted $52 Million Fraud on Financial Institution-4

42. In or about April 2019, TODD CAPSER, the defendant, contacted Financial Institution-4, seeking a loan of approximately $52 million for the refinancing of the $43.3 million loan that Financial Institution-1 had extended. CAPSER again communicated that CC-1's investment portfolio at Trust Company-1 could serve as collateral for the loan.

43. In or about April 2019, TODD CAPSER, the defendant, told Financial Institution-4 that he and CC-1 had sold a family ranch in Montana for approximately $400 million and had put the proceeds of the sale into an account at Trust Company-1. CAPSER represented that he and CC-1 would use approximately $122 million of the assets in the Trust Company-1 account to secure an approximately $52 million refinancing loan from Financial Institution-4.

15

44.   In or about April 2019, TODD CAPSER, the defendant,
sent Financial Institution-4 a version of the purported account
control agreement with Trust Company-1.

45.   In or about April 2019, Financial Institution-4 and
TODD CAPSER, the defendant, signed a term sheet related to the
contemplated approximately $52 million refinancing loan.

46.   In or about April 2019, Financial Institution-4
decided not to extend the contemplated approximately $52 million
refinancing loan to TODD CAPSER, the defendant.

### Statutory Allegations

47.   From at least in or about January 2016 through at
least in or about April 2019, in the Southern District of New
York and elsewhere, TODD CAPSER, the defendant, CC-1, and others
known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

48.   It was a part and object of the conspiracy that TODD
CAPSER, the defendant, CC-1, and others known and unknown,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television

16

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

49.  The allegations contained in Paragraphs 1 through 47 are repeated, realleged, and incorporated by reference as though fully set forth herein.

50.  From at least in or about January 2016 through at least in or about April 2019, in the Southern District of New York and elsewhere, TODD CAPSER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, CAPSER, using emails, phone calls, and other means, made false and misleading representations regarding, among other things, an investment

17

portfolio worth tens of millions of dollars that CC-1 purportedly held at Trust Company-1, as well as his, CC-1's, and their family's financial assets, for the purpose of obtaining tens of millions of dollars in loans from the Financial Institutions, and by doing so fraudulently induced Financial Institution-1 to loan him approximately $43.3 million.

## COUNT THREE
## (Aggravated Identity Theft)

The Grand Jury further charges:

51. The allegations contained in Paragraphs 1 through 47 are repeated, realleged, and incorporated by reference as though fully set forth herein.

52. From at least in or about January 2016 through at least in or about April 2019, in the Southern District of New York and elsewhere, TODD CAPSER, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, CAPSER forged the signature of Employee-2 on documents he sent to Financial Institution-1 and Financial Institution-2, created fake emails accounts for Employee-3 and Employee-4, and sent emails from those fake accounts purportedly from Employee-3 and Employee-4 to Financial Institution-2, during and in relation to the conspiracy to

18

commit wire fraud and wire fraud charged in Counts One and Two of this Indictment, knowing that the means of identification belonged to other actual persons.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH THREE ~~Two~~

53.   As a result of committing the offenses alleged in Counts One and Two of this Indictment, TODD CAPSER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

54.   If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which
cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p) and Title 28, United States
Code, Section 2461(c), to seek forfeiture of any other property
of the defendants up to the value of the forfeitable property
described above.

    (Title 18, United States Code, Section 982; Title 21, United
    States Code, Section 853; and Title 28, United States Code,
                        Section 2461.)

GRAND JURY FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v. -

TODD CAPSER,

**Defendant.**

### INDICTMENT

19 Cr.

(Title 18, United States Code, Sections
1349, 1343, 1028A(a)(1), 1028A(b),
and 2)

GEOFFREY S. BERMAN

Foreperson                    U.S. Attorney.

5/7/19

Filed Indictment - Sealed
Filed Arrest Warrant
Filed True Bill

21                  Wang, USMJ