

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, NY 10007*

March 13, 2020

**BY ECF**

The Honorable J. Paul Oetken
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *United States v. Capser*, **19 Cr. 337 (JPO)**

Dear Judge Oetken:

    The Government writes in advance of sentencing in the above-referenced matter, to bring to the Court's attention the details of new fraudulent conduct engaged in by Todd Capser since his arrest and guilty plea in this matter. Such conduct violates the conditions of the defendant's pretrial release and will be highly relevant as a sentencing consideration pursuant to Title 18, United States Code, Section 3553. Should the defendant contest the facts set forth below, the Government is prepared to prove them at a *Fatico* hearing.

## I.    Background

    Since in or about December 2018, the Government has been investigating Todd Capser, the defendant, for his involvement in a wire fraud scheme pursuant to which he induced a financial institution to loan approximately $43.3 million—and attempted to induce other financial institutions to loan approximately similar amounts—to an entity that he incorporated for the purchase and refinancing of two chemical and oil tankers ("Wire Fraud Scheme-1"). One of the ways that the defendant perpetrated Wire Fraud Scheme-1 was by creating fake email accounts and documents in the name of his father and pretending to be his father during his interactions with certain of the financial institutions. The defendant also provided altered and forged documents to certain of the financial institutions during the course of Wire Fraud Scheme-1.

    On May 7, 2019, a grand jury sitting in the Southern District of New York returned a three-count indictment (the "Indictment") against the defendant for his involvement in Wire Fraud Scheme-1, charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Count Two); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), 1028A(b), and 2 (Count Three). (*See* ECF No. 1.)

    On July 2, 2019, the defendant pleaded guilty to Count Two of the Indictment. On December 3, 2019, shortly before the then-scheduled sentencing, the Government informed the Court that it had identified a distinct fraud perpetrated by the defendant since the time of his arrest

and plea, and requested that sentencing be adjourned sine die to allow the parties to further confer regarding whether a *Fatico* hearing would be necessary. (*See* ECF No. 20.)

Thereafter, the Government agreed to submit a letter setting forth the allegations that it would be prepared to prove at a *Fatico* hearing, so that the defendant could consider whether to admit the conduct or demand a *Fatico* hearing.

## II. Wire Fraud Scheme-2

Since pleading guilty to Wire Fraud Scheme-1, the defendant has engaged in a pattern of fraudulent conduct by once again pretending to be his father, creating multiple email addresses, and submitting fake documents in an attempt to obtain millions of dollars in financing ("Wire Fraud Scheme-2").

As set forth below, beginning in or about June 2019, the defendant worked with another individual ("CC-1")[1] in an attempt to broker gold mining deals, through CC-1's company ("Company-1"), between purported overseas gold sellers and certain domestic and international refineries. In order to provide comfort to prospective sellers that Company-1 and the refineries would meet their obligations after any gold was delivered, the defendant sought a trade credit insurance policy. In simple terms, trade credit insurance protects the seller of a particular good from the risk that a buyer will default or go bankrupt and is unable to pay the seller.

Since September 2019, the defendant has submitted applications for trade credit insurance to at least three separate companies. In connection with each of these applications, the defendant made multiple misrepresentations, as detailed below.

### A. Defendant's Relationship to CC-1

The defendant was first introduced to CC-1 through another individual ("Individual-1"), whom the defendant met while he was in federal custody in connection with Wire Fraud Scheme-1. Individual-1 was also in custody at the time, and was recently sentenced to 125 months in prison for a multi-million dollar scheme to defraud investors who gave Individual-1 money for oil and gas leases and art work.

On June 5, 2019—one day after the initial pretrial conference before Your Honor—the defendant sent CC-1 an introductory email from his personal email account. The subject line of the email read, "Todd Capser: Potential Gold Transaction." Over the next month, the defendant and CC-1 exchanged multiple emails referencing the possibility of defendant's family obtaining a letter of credit to provide proof of funds for potential gold mining transactions. The emails between CC-1 and the defendant show that, ultimately, CC-1 became concerned with the defendant's family's ability to provide the letter of credit.

---

[1] For the avoidance of doubt, the Government notes that the individual described as "CC-1" in this letter for purposes of Wire Fraud Scheme-2 is not the same individual described as "CC-1" in the Indictment charging Wire Fraud Scheme-1.

      The defendant then began his attempts to obtain a trade credit insurance policy in lieu of a letter of credit. Such a policy would serve to provide financial backing for any potential gold mining transactions that Company-1 brokered. Indeed, on September 23, 2019, months after his guilty plea in this case, the defendant sent CC-1 an email describing the benefits of obtaining a trade credit insurance policy, noting that the policy was "backed financially by my family," so that if "the insurance company cannot recover their loss from the refiner . . . [they can] recover losses directly from my family." The defendant also asked that CC-1 not "use my family name when speaking with the seller."

      Neither the defendant nor his family have a high net worth, and they have never had any significant involvement in the gold industry.[2] As such, any representations to CC-1 or others about the defendant's or the defendant's family's ability to provide multimillion dollar financial backing for a gold transaction are highly suspect.

### B. Application to Insurance Firm-1

      On September 19, 2019, the defendant created a particular email address ("Email Address-1"), which had the defendant's phone number as the contact number and referenced his father as the user associated with the account. Later that day, the defendant used Email Address-1 to contact a broker at an insurance brokerage firm ("Insurance Firm-1") seeking to obtain a trade credit insurance policy for a purported gold transaction with a seller in Dubai. In that email, the defendant represented himself as his father. The defendant then sent the broker signed applications "for the three refineries we would propose using for this next contract," each seeking insurance coverage of approximately $10 million.

      Over the course of the next several days, the defendant exchanged multiple emails with Insurance Firm-1 in an attempt to satisfy the broker's requests for information to verify Company-1's legitimacy. In each of those emails, the defendant continued to represent himself as his father.

      During this time, the defendant also made other fraudulent misrepresentations to Insurance Firm-1. For example, on September 30, 2019, the defendant sent the broker an email attaching documentation (received from CC-1) relating to a purported standby letter of credit issued by an account at international bank in the benefit of Company-1. The standby letter of credit was purportedly valued at approximately €15 million. The defendant told the broker that "this is from an investor overseas" for a different mining project, but that it demonstrated the existence of Company-1's corporate account and "[Company-1's] longstanding background in the precious metals trade." The defendant also urged the broker to share these documents with Insurance Firm-1's underwriters. In truth and in fact, however, these were forged documents. Indeed, the Government has confirmed that the account from which the purported standby letter of credit was issued does not exist.[3]

---

[2] Indeed, false claims of family wealth were a key component of the defendants' fraudulent procurement of loans in Wire Fraud Scheme-1. (*See, e.g.*, ECF No. 1, Indictment at ¶ 11.)

[3] Based on a review of emails belonging to CC-1, it appears that CC-1 told the defendant on September 26, 2019, that Company-1's bank could not locate the purported €15 million standby letter of credit. Nevertheless, the defendant sent these documents to Insurance Firm-1 four days

Later that morning, the broker responded to the defendant's email to notify him that Insurance Firm-1 would be withdrawing Company-1's applications, citing a lack of comfort with the defendant's ability to provide requested documentation.

### C. Application to Insurance Firm-2

On the same day that the defendant received Insurance Firm-1's rejection, the defendant cold-called a broker at another insurance brokerage firm ("Insurance Firm-2") purporting to be his father and seeking assistance in obtaining a trade credit insurance policy. Later that evening, the defendant used Email Address-1 to send the broker a draft application seeking up to $20 million in coverage for the purported gold transaction out of Dubai. The defendant attached several documents in support of the application, including the fake €15 million standby letter of credit documents described above.

Over the next few weeks, the defendant made multiple fraudulent misrepresentations to the broker over the phone. On those calls, the defendant purported to be his father and explained that he was representing Company-1 in connection with a potential multimillion dollar gold transaction. The defendant also told the broker that he was working with Company-1 because he came from a wealthy and well-connected family. On one occasion, the caller identification on the broker's telephone came up as "Todd Capser." The broker used Google to research Todd Capser, and learned of his conviction in connection with Wire Fraud Scheme-1. The broker confronted the defendant with that information. In sum and substance, the defendant admitted that the information was true, but—purporting to be his father—stated that it was about his son Todd Capser, not him, and that Todd Capser had participated in a bad business deal for which he was now paying.

The defendant also took steps to affirmatively mislead Insurance Firm-2 over email. On October 8, 2019, the defendant emailed CC-1 from his personal email account asking that CC-1 "send something similar to the below to my father this evening[.] Please do not include me on it. We are going to play good cop/bad cop with regards to the 'Trade Credit Policy.'"

The email provided the following sample text for CC-1 to send to Email Address-1:

> [*Defendant's father*], *good evening. As you are aware I am leaving for Mexico in the morning. We are at serious risk of losing both a gold and silver contract. Both of these contracts are significant. Can we get the trade credit policy terms immediately so that I can provide the information to the sellers before they decide to sell to someone else?*

Approximately twenty minutes later, CC-1 sent an email to Email Address-1, purportedly addressed to the defendant's father, with substantially the same sample text provided by the defendant. The following day, the defendant forwarded CC-1's email from Email Address-1 to

---

later in an attempt to satisfy concerns about Company-1's legitimacy. The Government is continuing to investigate the origin of these documents, including the individuals who may have been involved in creating and transmitting them.

the defendant's personal email account, with "Test" in the body of the message. A few minutes later, the defendant then used Email Address-1 to forward CC-1's email to the broker at Insurance Firm-2, stating in sum and substance, that he had "received the below email from [CC-1] last night" and that "[CC-1] is feeling a lot of pressure to perform before we lose the gold contact that he just spent two weeks overseas negotiating." After sending this email, the defendant continued to inquire with the broker as to the status of the application, citing increased pressure from sellers.

On October 16, 2019, Insurance Firm-2 notified the defendant that it had been unable to "identify a carrier who is willing to underwrite the policy [that Company-1] requested." The Government is unaware of any further emails sent from Email Address-1 after this date.

### D. Application to Insurance Firm-3

On October 18, 2019, two days after receiving the rejection from Insurance Firm-2, the defendant created a new email account that referenced his father's name and Company-1 in the address ("Email Address-2"). Email Address-2 had the defendant's telephone number as the contact number on the account.

The first email that the defendant sent from Email Address-2 was to a salesperson at an international credit insurance company ("Insurance Firm-3"). In the email, the defendant once again represented himself as his father and attached several documents in support of a trade credit insurance application for Company-1, including the fake €15 million standby letter of credit documents described above.

Between October 18, 2019 and December 16, 2019, the defendant used Email Address-2 to exchange numerous emails with Insurance Firm-3, in an attempt to obtain a trade credit insurance policy and demonstrate Company-1's legitimacy. The defendant signed each of those emails as his father and also made additional fraudulent misrepresentations. For example, on November 7, 2019, the defendant sent the salesperson an email noting that "[Company-1 is] very much looking forward to working with you and [Insurance Firm-3] for many years to come. We have a lot more business coming through our doors literally as we speak." The defendant went on to list various refining companies that were purportedly going to do business with Company-1. In fact, neither the defendant nor Company-1 had active accounts with these refineries at the time.

Moreover, on November 12, 2019, in response to additional requests for information about Company-1, the defendant sent Insurance Firm-3 an email stating, in sum and substance, that Company-1 operates a warehouse mill in Nevada in which "[a] lot of work is still occurring . . . and it is where all mine samples are sent for processing and small-scale refinement occur." The defendant also provided the address of the purported warehouse mill. Two days later, the defendant sent the salesperson another email attaching "an energy utility bill for the warehouse mill plant in Nevada where all refining of South American gold samples are sent and processed for [Company-1]," and further stating, "I hope this is helpful for your underwriters." The defendant received the utility bill from CC-1. In truth, while CC-1 leases the land from the Bureau of Land Management, the address is an empty lot with a couple of residential trailers whose landlord and tenants are unaware of any mining or refining processes currently occurring on the property.

On December 16, 2019, Insurance Firm-3 notified the defendant that it had declined to proceed with the application and that the defendant should "cease further contact with our office and personnel regarding this matter."

\*\*\*

As demonstrated above, the defendant has made multiple fraudulent misrepresentations to at least three separate companies in the insurance industry since pleading guilty to Count Two of the Indictment. Should the defendant not admit to the conduct set forth above, the Government is prepared to prove it by a preponderance of the evidence at a *Fatico* hearing prior to the defendant's sentencing.

The Government thus respectfully requests that the Court set a conference date in 30 days at which the defendant shall either admit the alleged conduct and proceed to sentencing, or permit the Government to call witnesses and submit documentary evidence at a *Fatico* hearing.

Respectfully Submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____
David J. Robles
Assistant United States Attorney
Southern District of New York
(212) 637-2550

Granted.

A *Fatico* Hearing in this matter is scheduled for April 28, 2020 at 12:00 pm.

So ordered.

March 16, 2020

_____
J. PAUL OETKEN
United States District Judge