UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

TODD CAPSER,

                Defendant.

19 Cr. 337 (JPO)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

David J. Robles
Benjamin Woodside Schrier
Assistant United States Attorneys
    *Of Counsel*

## I. Introduction

The Government respectfully submits this memorandum regarding the sentencing of Todd Capser, the defendant in the above-captioned case, which is scheduled to take place on December 8, 2021. For the reasons set forth below, the Court should sentence the defendant to a significant term of imprisonment—such as the 84 months recommended by the United States Probation Office ("Probation") in the October 24, 2019 final revised Presentence Investigation Report (the "PSR")—that is nevertheless below the applicable United States Sentencing Guidelines (the "Guidelines or "U.S.S.G") range of 121 to 151 months' imprisonment.

## II. Background

### a. *The Defendant's Offense Conduct*

As described in greater detail in the May 7, 2019 indictment (the "Indictment"), *see* Dkt. No. 1, and the PSR, between January 2016 and April 2019, the defendant and at least one co-conspirator perpetrated a highly sophisticated, sprawling scheme to defraud a financial institution ("Financial Institution-1") based in Toronto, Canada, by inducing it, through false and misleading representations and omissions, to loan approximately $43.3 million to an entity incorporated by the defendant ("Capser Entity-1") for the purchase of two chemical and oil tankers (collectively, the "Tankers"). *See* PSR ¶ 10. The defendant's scheme was successful, causing widespread and extensive losses to Financial Institution-1 and various other related entities and individuals that are virtually impossible to fully quantify. Additionally, after defrauding Financial Institution-1, the defendant attempted to similarly defraud other financial institutions and entities (collectively, the "Financial Institutions"). It is likely that he was unsuccessful in those attempts only because of the intervention of the Federal Bureau of Investigation ("FBI").

Among the more significant of the false and misleading representations and omissions that the defendant made to certain of the Financial Institutions were that he and his family had substantial assets that could be used as collateral for the fraudulent loans that he sought, including a cattle company, a ranch, related real property, cash, and securities. *See id.* ¶¶ 21-22. In fact, none of the foregoing assets existed, and the defendant had negligible assets available for collateral. *See id.* ¶ 22. To create the false impression that the defendant had substantial assets, he sent certain of the Financial Institutions various documents that he had altered and forged. *See id.* ¶ 23.

For example, the defendant sent Financial Institution-1 a document purporting to be a statement of the account holdings of his father (the "Father") at a company that provides wealth-management services to private clients ("Trust Company-1"). The document listed more than 60 companies in which the Father purportedly owned shares. *See id.* The total market value of the listed shares was approximately $19.2 million. *See id.* But neither the defendant nor his Father ever held an account at Trust Company-1 or owned the listed shares. *See id.* The defendant had previously obtained actual documents from Trust Company-1, which he used as the basis for the altered and forged documents that he sent to Financial Institution-1, by fraudulently exploiting the relationship between Trust Company-1 and the family of his former fiancée, who were actual clients of Trust Company-1. *See id.* ¶¶ 16-19.

The defendant later started sending Financial Institution-1 what he claimed were daily statements from Trust Company-1 purporting to show his Father's account balance. *See id.* ¶ 43. In actuality, the defendant had forged the statements. *See id.* To ensure that the forged statements withstood scrutiny, the defendant made sure that the fake account balance in the statements accurately reflected the daily prices of the stocks that he was pretending his Father owned. In

other words, the forged statements that the defendant sent to Financial Institution-1 accounted for daily fluctuations in the prices of more than 60 stocks. The defendant also created a fake email account designed to look like it belonged to an employee of Trust Company-1 to make it appear as though that employee was sending him the forged statements before he sent them to Financial Institution-1. *See id.*

On July 22, 2016, Financial Institution-1 sent the defendant, Capser Entity-1, and another entity incorporated by the defendant ("Capser Entity-2") a commitment letter for the financing of the purchase of the Tankers, which were owned by a Hong Kong shipping firm ("Shipping Firm-1"). *See id.* ¶ 24. The purchase price of the Tankers was approximately $20.4 million each, for a total of approximately $40.8 million. *See id.* The loan that Financial Institution-1 committed to extend to the defendant was a bridge loan—that is, a short-term loan with a relatively high interest rate that was designed to be used only until longer-term financing could be secured. *See id.* ¶ 21.

In August 2016, two other entities incorporated by the defendant ("Capser Entity-3" and "Capser Entity-4") entered into memoranda of understanding and bareboat charters related to the Tankers with two Panamanian subsidiaries (collectively, the "Shipping Firm-1 Subsidiaries") of Shipping Firm-1. *See id.* ¶ 25. A bareboat charter is a lease agreement whereby the charterers (here, the Shipping Firm-1 Subsidiaries) obtain possession and control of the ships (here, the Tankers) owned by the owners (here, Capser Entity-3 and Capser Entity-4). *See id.* The charterers pay the owners for the use of the ships, and also pay for the ships' operating expenses. *See id.* ¶ 26. In this case, the bareboat charters obligated the Shipping Firm-1 Subsidiaries to pay Capser Entity-3 and Capser Entity-4 $8,500 per day, per ship. *See id.* In essence, the defendant's plan

was for Capser Entity-3 and Capser Entity-4 to buy the Tankers and immediately lease them back to the Shipping Firm-1 Subsidiaries. *See id.*

On September 28, 2016, the Shipping Firm-1 Subsidiaries sold the Tankers to Capser Entity-3 and Capser Entity-4. *See id.* ¶ 27. The Tankers were leased back to Shipping Firm-1 or the Shipping Firm-1 Subsidiaries pursuant to the bareboat charters. *See id.*

On October 5, 2016, Financial Institution-1 extended a loan to the defendant for $43.3 million for the purchase of the Tankers. *See id.* ¶ 28. The loan was extended through a credit agreement, pursuant to which interest on the loans was 12% per year, with the full amount due on April 5, 2018. *See id.* On October 6, 2016, at the defendant's direction, the Father signed an agreement with Financial Institution-1 pursuant to which the Father granted Financial Institution-1 a security interest in the account that he purportedly held at Trust Company-1 as collateral for the $43.3 million loan and the credit agreement. *See id.* ¶ 29. An account control agreement from Trust Company-1 was also made part of the credit agreement. *See id.* ¶ 30. The account control agreement, which was signed by the Father at the direction of the defendant, and also purportedly signed by an employee of Trust Company-1, was based on an actual document that the defendant had fraudulently obtained from Trust Company-1 by exploiting its relationship with his former fiancée's family. *See id.*

On October 6, 2016, payments totaling approximately $35 million were wired from an account controlled by Financial Institution-1 to an account controlled by Shipping Firm-1 for the purchase of the Tankers. *See id.* ¶ 31. A multinational investment bank and financial services company headquartered in New York, New York acted as an intermediary or correspondent bank for the transaction. *See id.*

On October 7, 2016, the Tankers were delivered to Capser Entity-3 and Capser Entity-4, and the Shipping Firm-1 Subsidiaries began operating the Tankers pursuant to the bareboat charters. *See id.* At some point after the Shipping Firm-1 Subsidiaries began operating the Tankers, the Shipping Firm-1 Subsidiaries experienced financial difficulties unrelated to the defendant's fraud. *See id.* ¶ 33. As a result, the Shipping Firm-1 Subsidiaries began defaulting on the payments that they owed to Capser Entity-3 and Capser Entity-4. *See id.* By March 2018, the Shipping Firm-1 Subsidiaries were over $1 million in arrears. *See id.* This put financial pressure on the defendant and made it difficult for him to pay the relatively high interest associated with the $43.3 million short-term bridge loan that he had fraudulently obtained from Financial Institution-1. *See id.* ¶ 34. As a result, the defendant started exploring fraudulent ways of refinancing the bridge loan with another financial institution. *See id.* ¶ 34.

In March 2018, the defendant retained a broker-dealer specializing in transport finance ("Broker-Dealer-1") to help Capser Entity-1 find a financial institution to refinance the $43.3 million loan from Financial Institution-1. *See id.* ¶ 34. Following the defendant's retention of Broker-Dealer-1, the defendant made numerous false and misleading representations to it regarding his, his Father's, and their family's financial assets that were substantially similar to the misrepresentations and omissions that he had previously made to Financial Institution-1. *See id.* Based on those misrepresentations and omissions, Broker-Dealer-1 began soliciting financial institutions as potential lenders for the longer-term refinancing loan that the defendant was seeking. *See id.* In total, at least seven financial institutions signed non-disclosure agreements or term sheets with the defendant and Capser Entity-1 pertaining to contemplated refinancing loans of between approximately $46 million and $52 million. *See id.*

On August 31, 2018, Broker-Dealer-1 contacted a global investment management corporation headquartered in New York, New York ("Financial Institution-2") and communicated that Broker-Dealer-1 had been engaged to assist Capser Entity-1 with the refinancing of an existing arrangement involving two oil tankers; that the target financing amount was approximately $46 million; and that collateral available included a diversified stock portfolio with a market value of approximately $70 million. *See id.* ¶ 38.

From September 2018 through December 2018, the defendant, Broker-Dealer-1, and Financial Institution-2 discussed the possibility of Financial Institution-2 extending an approximately $50.1 million loan to Capser Entity-1 to refinance the $43.3 million bridge loan from Financial Institution-1. *See id.* ¶ 39. In connection with those discussions, the defendant sent Financial Institution-2 several documents purporting to be from Trust Company-1, including an account control agreement between Trust Company-1, his Father, and Financial Institution-1, which was purportedly signed by an employee of Trust Company-1; a November 29, 2018 email purporting to be from Trust Company-1 to the Father stating that the balance of the Father's account was approximately $72.3 million; a December 4, 2018 email purporting to be from an employee at Trust Company-1 to the Father stating that, as of December 3, 2018, the closing balance for his account was approximately $73.2 million; and a December 4, 2018 email purporting to be from a different employee at Trust Company-1 to the Father stating that the closing balance for his account described in the December 4, 2018 email was correct. *See id.* The defendant created fake email accounts in the names of actual employees of Trust Company-1 to generate the fraudulent emails regarding the balances for his Father's fake account.

In December 2018, as part of its due diligence process for the $50.1 million loan that the defendant was seeking, Financial Institution-2 contacted Trust Company-1 to confirm the

existence of the Father's account. *See id.* ¶ 40. On December 4, 2018, Trust Company-1 informed Financial Institution-2 that the Father did not hold, and had never held, an account at Trust Company-1 or any of its affiliates, and that it believed the documents purporting to be from Trust Company-1 that the defendant had sent to Financial Institution-2 were altered or forged. *See id.* Shortly thereafter, Financial Institution-2 alerted the FBI about the defendant's fraudulent scheme, which the FBI began investigating.

On December 4, 2018, the defendant participated in a conference call with employees of Financial Institution-2. *See id.* ¶ 41. Also participating in the call was an individual who purported to be an employee of Trust Company-1, but who was in fact an unidentified co-conspirator of the defendant. *See id.* Financial Institution-2 communicated to the defendant that it was aware that neither he nor his Father held any account or assets at Trust Company-1, and that Financial Institution-2 would not proceed with the approximately $50.1 million refinancing loan. *See id.*

On December 5, 2018, the defendant left a voicemail for an employee of Financial Institution-2 in which he stated, "I imagine you're not supposed to speak with me, but I was hoping you might call me, as I need to apologize to you man to man." *See id.* ¶ 42. On the voicemail, the defendant sounded upset and emotional.

In December 2018, the defendant participated in a phone call with employees of Financial Institution-1, in which he admitted to aspects of his fraudulent scheme, including that neither he nor his Father had ever had any account at Trust Company-1; that he had fabricated the daily statements from Trust Company-1 purporting to show his Father's account balance; and that he had created fake email accounts for Trust Company-1 employees to send the fabricated statements. *See id.* ¶ 43. Again, during the call, the defendant sounded upset and emotional.

Despite the defendant's stated interest in apologizing to the employee of Financial Institution-2, and the apparent emotion he communicated on the voicemail and during his call with the employees of Financial Institution-1, between January 2019 and April 2019, he attempted to defraud at least two other financial institutions based in Dallas, Texas ("Financial Institution-3") and Salt Lake City, Utah ("Financial Institution-4"), respectively, of refinancing loans of between $46 million and $52 million each. *See id.* ¶¶ 45-49. The fraudulent representations and omissions that the defendant made to Financial Institution-3 and Financial Institution-4 in furtherance of his attempted fraud were similar to those that he had previously made to Financial Institution-1 and Financial Institution-2. *See id.* Financial Institution-3 and Financial Institution-4 each declined to extend a refinancing loan to the defendant, in large part because the FBI alerted them to the defendant's fraud before the deals could be finalized. Based on the defendant's inability to obtain a fraudulent refinancing loan, he repeatedly defaulted on the interest he owed on the $43.3 million loan to Financial Institution-1, as well as on the entirety of the loan itself.

Throughout the foregoing fraud and attempted frauds, in an effort to engender sympathy, deflect questions, and explain suspicious behavior, the defendant falsely represented to certain of the Financial Institutions that his daughter was terminally ill with cancer. *See id.* ¶ 13.

On May 7, 2019, a grand jury sitting in the Southern District of New York returned the Indictment against the defendant, charging him with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Two); and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2 (Count Three). *See* Dkt. No. 1.

On May 9, 2019, the defendant was arrested in the District of Montana, presented, and ordered detained pending his transportation by the United States Marshals Service (the "USMS")

to the Southern District of New York. *See* Dkt. May 9, 2019 Minute Entry. On May 30, 2019, the defendant was presented before Magistrate Judge James L. Cott of the Southern District of New York and bailed. *See* Dkt. No. 5. On July 2, 2019, the defendant appeared before the Court and pleaded guilty to Count Two of the Indictment pursuant to a plea agreement (the "Plea Agreement") with the Government. *See* Dkt. July 2, 2019 Minute Entries. In the Plea Agreement, the parties agreed that the defendant's Guidelines range was 121 to 151 months' imprisonment. The United States Probation Office calculated an identical Guidelines range in the PSR. *See* PSR at 22.

Following the revelation of the defendant's fraud, Financial Institution-1 began protracted and expensive legal proceedings to seize the Tankers, which were ultimately successful. Since the date of the Tankers' sale to Capser Entity-1, their value has depreciated significantly. When the Tankers were sold, they were collectively valued at approximately $40.8 million; they are now collectively valued at approximately $25 million, a decrease of approximately $15.8 million.[1]

      b.  *The Defendant's Distinct Fraud While Awaiting Sentencing*

On December 3, 2019, shortly before the defendant's originally scheduled sentencing hearing, the Government informed the Court that it had identified a distinct fraud ("Wire Fraud Scheme-2") perpetrated by the defendant after his arrest and plea and requested that sentencing be adjourned sine die to allow the parties to further confer about whether it would be necessary for the Court to hold a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (a

---

[1] Attached hereto as Exhibit A are valuation certificates for the Tankers dated October 5, 2021, which Financial Institution-1 provided to the Government. The Government has been working with Financial Institution-1 to calculate the losses that Financial Institution-1 suffered as a result of the defendant's fraud and will submit a proposed restitution order reflecting those calculations to the Court within 90 days of the defendant's sentencing hearing.

9

"*Fatico* hearing"). *See* Dkt. No. 20. On December 4, 2019, the Court granted the Government's request. *See* Dkt. No. 21.

On March 13, 2020, the Government filed a letter with the Court explaining what it had uncovered through its investigation of Wire Fraud Scheme-2. *See* Dkt. No. 25. The Government's letter describes the contours of Wire Fraud Scheme-2 in greater detail, but as a general matter, the Government determined that, once again, the defendant had engaged in a pattern of fraudulent conduct by pretending to be his father, creating multiple email addresses, and submitting fake documents in an attempt to obtain millions of dollars in financing. *See id.* Through Wire Fraud Scheme-2, the defendant attempted to fraudulently obtain trade credit insurance from at least three different companies related to his supposed attempt to broker international gold-mining deals. *See id.* The defendant was actively engaged in Wire Fraud Scheme-2 when he appeared before the Court and pleaded guilty to the instant offense conduct. *See id.* On April 15, 2020, defense counsel filed a letter with the Court stating that the defendant did not intend to contest the allegations made in the Government's March 13, 2020 letter at sentencing, and that a *Fatico* hearing was therefore unnecessary.

**III.    Discussion**

In this case, a significant term of imprisonment in the vicinity of 84 months is warranted, but a sentence within the Guidelines range of 121 to 151 months' imprisonment would risk being greater than necessary to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public from further crimes of the defendant, as required by 18 U.S.C. § 3553(a).

Nevertheless, all five of the foregoing factors militate strongly in favor of a substantial incarceratory sentence. At the outset, the defendant's offense was extremely serious. He

defrauded a financial institution of $43.3 million through highly sophisticated and duplicitous means. As discussed above, the defendant's conduct caused Financial Institution-1 to suffer substantial losses, which the Government and Financial Institution-1 are still in the process of attempting to quantify. In an effort to recover its losses, Financial Institution-1 also filed a federal civil action against the defendant in the District of Montana, which caused Financial Institution-1 to incur additional legal and other costs. *See Third Eye Capital Corporation v. Todd Michael Capser Et Al.*, 19 Civ. 38 (SPW) (D. Mt.). In February 2011, judgment was entered against the defendant on one count of Financial Institution-1's complaint, but the remainder of the case is currently stayed. *See id.* at Dkt. No. 37.

Further, the harm that the defendant caused was not limited to Financial Institiution-1, his primary victim. When Financial Institution-1 began legal proceedings to seize the Tankers, other entities intervened, claiming an interest in the Tankers, including entities associated with Shipping Firm-1. Aspects of those proceedings remain ongoing. Moreover, many of the Financial Institutions and other entities that the defendant attempted to defraud were forced to expend significant time, energy, and money to investigate his conduct, reconstruct their interactions with him, and respond to Government requests or subpoenas for relevant information. Just punishment for such a serious and expansive offense, which negatively affected so many entities and individuals, requires a considerable term of imprisonment.

A substantial incarceratory sentence is also required to promote respect for the law, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. Throughout his offense conduct, and even while awaiting sentencing, the defendant repeatedly demonstrated his deep and consistent commitment to crime. After the defendant successfully defrauded Financial Institution-1 of $43.3 million, Financial Institution-2 caught him

11

in the act of trying to defraud it of another $50.1 million.  The defendant pretended to cry and said that he wanted to apologize.  Those were crocodile tears.  The next month, the defendant was back at it again, following essentially the same playbook to try and defraud Financial Institution-3.  And when that did not work, he moved on to Financial Institution-4.  The only reasonable inference to be drawn is that, if the defendant had not been arrested, he would have continued attempting to defraud even more financial institutions until he succeeded.  And he might have succeeded in defrauding Financial Institution-3 or Financial Institution-4 if the FBI had not timely intervened.  The defendant's repeated attempts to defraud multiple entities makes him much more culpable than an individual who attempts to commit a fraud only once.  Cf. *United States v. Ravelo*, 370 F.3d 266, 274 (2d Cir. 2004) (Raggi, J., concurring in part) ("Multiple attempts demonstrate . . . the defendant's . . . strong commitment to crime.  After all, each of the defendant's attempts . . . constitutes a separate and distinct violation of the law, and an offense committed through multiple criminal acts may well be deemed more serious for purposes of sentencing than an offense involving a single infraction of law.  To ignore this fact is to send would-be criminals a message that if at first they do not succeed in their illicit objectives, by all means try again because successive attempts to violate the law are 'free.'").

      What is more, being charged with serious federal felonies in New York was not enough to deter the defendant from attempting to commit additional fraud.  Nor was being arrested by the FBI in Montana, detained, and transported to New York by the USMS.  Nor was pleading guilty to a federal felony before the Court.  Even as the defendant waited for the Court to impose sentence for his offense conduct, he committed another, distinct fraud—once more using his partially successful playbook of pretending to be his father, creating multiple email addresses, and submitting fake documents in an attempt to obtain millions of dollars in financing.

Indeed, the defendant was so dedicated to his fraud that he was willing to use his young daughter as an instrument to accomplish it. He took advantage of his victims' best qualities—their compassion and empathy—to distract them with a fabricated tale that his daughter was terminally ill so that they would be less likely to notice the red flags that began to proliferate as he became increasingly desperate. The defendant used his own Father, too. The extent to which the defendant's Father was a co-conspirator in the fraud, as opposed to another unwitting instrument, remains unclear.[2] Even if the Father was a co-conspirator, however, he was undeniably acting at the direction of the defendant. And the defendant's exploitation of his former fiancée and her family was the genesis of his offense conduct.

There is every indication that the defendant remains undeterred, committed to fraud, and a danger to the community. A serious incarceratory sentence is necessary to ensure that he is deterred from committing additional frauds and to protect the public from further frauds that he may commit before he learns his lesson.

---

[2] The Father was described in the Indictment as "CC-1."

**IV.     Conclusion**

For the reasons set forth above, the Court should sentence the defendant to a significant term of imprisonment—such as the 84 months that Probation recommended in the PSR—that is nevertheless below the applicable Guidelines range of 121 to 151 months' imprisonment.

Dated:  December 1, 2021
        New York, New York

                                              Respectfully submitted,

                                              DAMIAN WILLIAMS
                                              United States Attorney for the
                                              Southern District of New York

                                        By:   _____
                                              Benjamin Woodside Schrier
                                              Assistant United States Attorney
                                              (212) 637-1062

**EXHIBIT A**



# CW Kellock
## Eggar Forrester

Founded 1820
Brokers and Appraisers to the Marshal of the Admiralty

5 October 2021

Third Eye Capital
3930 – 161 Bay Street
Toronto, ON M5J 2S1
Canada

## VALUATION CERTIFICATE
### mt "Cygnus"
### Chemical/oil tanker. 51,218 dwt. Built 2007 STX, S Korea. BWTS. CAP1
### IMO Number 9354260

We have considered as requested the value of the above vessel. From the particulars given to us for the preparation of this valuation and from such other information as we have available, taking into account similar vessels which have been sold and which have been offered for sale and using our market knowledge and experience, we consider the vessel's value to be in the region of

### US$ 13,000,000 (thirteen million United States dollars)

This valuation is for the sole use of the party in whose name it is issued and no liability to any other party can be accepted. It has been carried out on the basis that the vessel is in sound trading condition, fully equipped and with valid certificates and class maintained, freely transferable without any sale restrictions as between a willing buyer and a willing seller on normal commercial sale terms for early delivery within an acceptable delivery range. Market conditions are particularly difficult and valuations are a statement only of our opinion: no assurance can be given that this valuation will be sustained or is realisable in actual transactions. Our usual valuation conditions below apply.

Yours faithfully
For and on behalf of
C.W. Kellock & Co. Ltd.

Director

Valuations are given by us subject to the following conditions:

1. The Valuation relates solely to the date/place referred to and we emphasise that it is a statement of our opinion only, and is not a representation of fact or of the correctness of the particulars or information available to us upon which our opinion is based.
2. All particulars detailed are from information given to us and such other information as we have been able to obtain from the relevant works of reference in our possession, but we can accept no responsibility for their accuracy. We have not made a physical inspection of the vessel, nor have we inspected the vessel's classification records. Unless otherwise stated the vessel is assumed to be free of charter commitment and freely transferable
3. The Valuation is solely for the information of the person instructing us, but if he intends to act upon this Valuation he should first satisfy himself by inspection of the vessel or otherwise as to the correctness of the particulars given.  It is not to be used without our consent in any public offering in respect of shares, bonds, etc, nor in any arbitration/court proceedings and we reserve the right to withhold such consent without providing any reason for such refusal.
4. No assurance is given that the value will be sustained, nor that it would be realisable in an actual transaction.

CW Kellock & Co Ltd
London Wall Buildings, London Wall, London EC2M 5PP
Phone +44 20 7448 1395 Fax +44-20-7382 7706  kellock@eggarforrester.com  www.cwkellock.com
*A member of the Eggar Forrester Group. Registered in England, no. 553139*



# CW Kellock
Eggar Forrester

Founded 1820
Brokers and Appraisers to the Marshal of the Admiralty

5 October 2021

Third Eye Capital
3930 – 161 Bay Street
Toronto, ON M5J 2S1
Canada

## VALUATION CERTIFICATE
### mt "Sextans"
### Chemical/oil tanker. 51,215 dwt. Built 2007 STX, S Korea. SS due May 2022
### IMO Number 9358321

We have considered as requested the value of the above vessel. From the particulars given to us for the preparation of this valuation and from such other information as we have available, taking into account similar vessels which have been sold and which have been offered for sale and using our market knowledge and experience, we consider the vessel's value to be in the region of

### US$ 12,000,000 (twelve million United States dollars)

This valuation is for the sole use of the party in whose name it is issued and no liability to any other party can be accepted. It has been carried out on the basis that the vessel is in sound trading condition, fully equipped and with valid certificates and class maintained, freely transferable without any sale restrictions as between a willing buyer and a willing seller on normal commercial sale terms for early delivery within an acceptable delivery range. Market conditions are particularly difficult and valuations are a statement only of our opinion: no assurance can be given that this valuation will be sustained or is realisable in actual transactions. Our usual valuation conditions below apply.

Yours faithfully
For and on behalf of
C.W. Kellock & Co. Ltd.

*[signature]*

Director

Valuations are given by us subject to the following conditions:

1. The Valuation relates solely to the date/place referred to and we emphasise that it is a statement of our opinion only, and is not a representation of fact or of the correctness of the particulars or information available to us upon which our opinion is based.
2. All particulars detailed are from information given to us and such other information as we have been able to obtain from the relevant works of reference in our possession, but we can accept no responsibility for their accuracy. We have not made a physical inspection of the vessel, nor have we inspected the vessel's classification records. Unless otherwise stated the vessel is assumed to be free of charter commitment and freely transferable
3. The Valuation is solely for the information of the person instructing us, but if he intends to act upon this Valuation he should first satisfy himself by inspection of the vessel or otherwise as to the correctness of the particulars given.  It is not to be used without our consent in any public offering in respect of shares, bonds, etc, nor in any arbitration/court proceedings and we reserve the right to withhold such consent without providing any reason for such refusal.
4. No assurance is given that the value will be sustained, nor that it would be realisable in an actual transaction.

CW Kellock & Co Ltd
London Wall Buildings, London Wall, London EC2M 5PP
Phone +44 20 7448 1395 Fax +44-20-7382 7706  kellock@eggarforrester.com  www.cwkellock.com
*A member of the Eggar Forrester Group. Registered in England, no. 553139*